# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOSE RIVAS,

      Plaintiff,

vs.                                                                           No. CIV 98-0602 JC/WWD

KENNETH S. APFEL,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION
### Proposed Findings

    1. This matter comes before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing, filed December 21, 1999 [8-1]. The Commissioner denied Plaintiff's request for Social Security Disability Insurance and Supplemental Security Income (SSI) benefits. Plaintiff, age 41, alleges a disability which commenced March 29, 1994, due to back problems and generalized anxiety. His past relevant work includes work as a janitor, cook and commercial painter, all of which require medium exertional requirements, and which the ALJ found he could no longer perform. Tr. at 21.

    2. After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") denied the applications, finding that Mr. Rivas has a severe combination of impairments consisting of low back pain and generalized anxiety, but that the mental impairment does not diminish his ability to perform light, unskilled work. The ALJ concluded that Mr. Rivas is not disabled under the medical-vocational guidelines ("grids"). The Appeals Council declined

Mr. Rivas' request for review, thus the ALJ's decision is the final decision of the Commissioner. Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g).

3. The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. Id. (citation omitted).

4. Plaintiff raises the following allegations of error with respect to the ALJ's decision: (1) the ALJ erred at step two of the sequential evaluation when he found that Mr. Rivas' sexual dysfunction was not a severe impairment; (2) the ALJ's assessment of the impact of Mr. Rivas' mental problems on his ability to work is not supported by substantial evidence and is contrary to law; and (3) the application of the grids in this case was legally improper, as Mr. Rivas has nonexertional impairments that affect his ability to perform the functions that light and sedentary work requires.

5. "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." Thompson at 1486 (citing 42 U.S.C. §§423 (d)(1)(A); 1382c(a)(3)(A)). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920. The sequential evaluation
process ends if at any step the Commissioner finds that the claimant is disabled or not disabled. Id. (citations omitted).

6. At the first four levels of the evaluation, the claimant must show: (1) that he is not working; (2) that he has an impairment or combination of impairments severe enough to limit the ability to do basic work activities; (3) that the impairment meets or equals one of the listing of impairments in 20 C.F.R. Pt. 404, Subpt.P, App.1; or (4) that he is unable to perform work done in the past.

7. At step five, the burden shifts to the Commissioner to show that the claimant has a residual functional capacity ("RFC") to do work in the national economy other than past relevant work. Thompson at 1487 (citations omitted). The Medical-Vocational Guidelines ("grids") are used at this step to determine whether disability exists. 20 C.F.R. Part 404, Subpt. P, App. 2. The grids reflect the existence of jobs in the national economy at various residual functional capacity ("RFC") levels by incorporating administrative notice of occupational publications and studies. 20 C.F.R. §§404.1566(d); 416.966(d). This aids the Commissioner in determining what specific job types in the national economy the claimant can perform. The grids assume that the claimant's sole limitation is lack of strength, i.e., an exertional impairment. 20 C.F.R. Part 404, Subpt. P, App. 2, §2000(e)(2).

8. Plaintiff spent his early years in Cuba, and then in a Cuban prison for 12 years when he committed murder at the age of 11.[1] He came to the this country when he was given the option of leaving Cuba and entering the United States, or having to serve additional years in the Cuban prison. Tr. at 201. He was raped while he was in this prison and harbors much anger about the incident. Tr. at 221.

---

[1] Plaintiff told the ALJ at the hearing that he was imprisoned for killing the person who had murdered his brother. Tr. at 201.

9. Plaintiff alleges impairments associated with lower back pain, generalized anxiety and depression and a sexual dysfunction (premature ejaculation). He has a history of left thumb amputation following an injury. Tr. at 213. His back injury was a result of an injury while doing maintenance work in March 1994. He stated that he just "didn't feel well," that he felt pain in his back and leg and that his arms would hurt when he lifted something heavy. Tr. at 202-03. He has not attempted to work since then.[2]

10. Plaintiff was fired from his airport job held previous to that in 1991-1993. He hit a co-worker over the head with a board after the co-worker placed some marijuana in his locker and his boss found it. He told the ALJ he can't work because he's "afraid to be among people." Tr. at 206.

11. Plaintiff was using a cane at the hearing, and stated that when he walks even a half block, his legs and back go numb. Tr. at 206. He said that he sleeps for only about one and a half hours at a time before the back pain wakes him. He describes the pain as "constant." Tr. at 207-08. At the hearing, Plaintiff stated that he can stand for ten to fifteen minutes, sit for 15 to 20 minutes (although the ALJ noted that he had already sat during the hearing for about 35 minutes) and lift no more than 5 pounds. Tr. at 212-13.

12. Plaintiff's generalized anxiety predates his back impairment. He spoke of hearing voices making him want to "shoot [his] head off" or wanting to kill somebody, his wife or her two little boys. Tr. at 209-10, 221. He states that he has anxiety attacks every two or three weeks

---

[2] The thumb impairment does not figure into Plaintiff's bases for appeal. As the ALJ determined, the thumb's amputation at the distal joint does not hamper in any way the ability of Plaintiff, who is right-handed, to "to reach, feel and handle." Tr. at 18. Also, Plaintiff's issues on appeal do not concern his back problems.

4

which make him feel "scared" to talk to people or like "something is going to happen." Tr. at 219-20.

13. Plaintiff's sexual dysfunction has caused problems in his three marriages as well as in relationships with other women. In November 1994, he reported to Dr. Balcazar, a psychiatrist, that there are times "when he feels like taking his life while, on other occasions, he feels that since his penis is worth nothing, he should be cutting it off." Tr. at 97.

14. Plaintiff told the ALJ that he has never been in trouble with the law in this country, except for domestic problems. His wife[3] once called the police because he wanted to get "a gun or knife and . . . mak[e] love by force with her." Tr. at 210. Plaintiff said that his wife will no longer allow him to have sexual relations with her. As a result of not being able to have sex with his wife, Plaintiff stated that he "sometimes [goes] out in the street and [tries] to grab or touch a woman or something." Tr. at 218.

15. Plaintiff has made two suicide attempts, one by swallowing rat poison over a break up with a girlfriend (a neighbor observed him pouring a half package of rat poison into a beer and then drinking it), the other by trying to hang himself with a rope. Tr. at 209.[4] He was hospitalized for two weeks following one of the attempts in 1992, after which Plaintiff says he was sent to some type of "home." Id. At the time of the hearing, he was getting counseling every two or three months. Tr. at 218.

---

[3] The record refers to his partner as both "wife" and "girlfriend."

[4] The records contain evidence only of the first attempt.

16. Mr. Rivas alleges problems with memory and with handling money. He said that he used to drink excessively and used cocaine about five years ago, but doesn't use either substance anymore. Tr. at 211-12.[5] He still gets anxiety attacks, and the medications only sometimes help. Tr. at 217, 223. He lives with his wife, and her two young boys. Tr. at 199. Plaintiff told the ALJ that his wife bathes him because he cannot twist his back much. Tr. at 215.

17. He spends his day shut up in his home, sitting down and walking around the house. He does none of the household chores or yard work, has no hobbies and no recreational or social outlets. Tr. at 215. Friends visit him, but Plaintiff stated that he doesn't go out into the street. He wife won't leave her boys with him alone except for short times. He admits that he has wanted to hurt the boys, ages four and three, but has not acted out on those feeling as of yet. Tr. at 216. (". . . sometime I want to strangle them or I don't know what. They make me desperate. They make my mind very bad").

**First Alleged Error**

18. Plaintiff first alleges that the ALJ erred at step two of the sequential evaluation when he found that Mr. Rivas' sexual dysfunction was not a severe impairment. At step two, the ALJ must determine whether the claimant has an "impairment or combination of impairments which significantly limits [his]. . . ability to do basic work activities." Hinkle v. Apfel, 132 F.3d 1349 (10th Cir. 1997); 20 C.F.R. S 404.1520(c).

19. As the Commissioner notes and the ALJ ultimately decided, Plaintiff's sexual

---

[5] The medical evaluation done in August 1992 following his first suicide attempt indicates that he had a prior history of drinking 12 beers a day. Tr. at 128.

6

dysfunction in itself is not the type of condition that significantly limits a person's ability to perform most jobs. Resp. at 9; Tr. at 19.  Plaintiff saw a urologist who suggested surgery, but no follow-up was made.  He was also given pills for the problem, with no success.  Tr. at 127.

20.  However, I find that there is no error here, because the ALJ examined Plaintiff's problems in combination and did find Plaintiff's anxiety to be severe, although not equal to a listed impairment.  Tr. at 17, 20; see Hinkle v. Apfel, 132 F.3d 1349 (10th Cir. 1997) (regulations require consideration of claimant's impairments in combination at step two).  Medical histories and treatment notes in the record clearly indicate that the problem was related to Plaintiff's anxiety, which the ALJ did find to be severe under a step two analysis.  Plaintiff grew to obsess with his sexual dysfunction, even where there were questions of other psychological problems at issue.  Tr. at 110, 119, 123, 126.

**Second Alleged Error**

21.  Plaintiff next alleges that the ALJ's assessment of the impact of Mr. Rivas' mental problems on his ability to work is not supported by substantial evidence and is contrary to law.  In this part of his decision, based largely on the psychiatric examination done by Dr. Balcazar in November 1994, the ALJ determined that these problems "do not reduce [Plaintiff's] ability to perform at least a full range of light work."  Tr.at 21.

22.  According to Dr. Balcazar's report, Plaintiff exhibited "some degree of anxiety," but his attention span was good.  Dr. Balcazar did not detect any delusional thinking, and opined that although Plaintiff talked about internal voices, they sounded more like "intense, vivid thought" as opposed to "clear hallucinations."  Tr. at 99.  The psychiatrist noted that Plaintiff's generalized anxiety was "very much related to his sexual problems."  Id.  He also opined that Mr. Rivas

7

"could be employable in an unskilled type of working situation." See Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995) (ALJ may look to see whether doctor has opined that claimant can perform work). In fact, Dr. Balcazar noted that the reason Plaintiff stopped work was because of his back problem.[6]

23. After Plaintiff attempted suicide in 1992, the medical records reflect that Plaintiff demonstrated "some paranoid ideation" and that he had concerns about not having a job and obtaining disability. He was started on Prolixin at this time. He was given a discharge diagnosis of schizophreniform disorder and alcohol abuse. Tr. at 28.[7] By the time Plaintiff was discharged, he was found to be "significantly improved" with no suicide ideation, hearing no more voices and was stating that he felt "great." Tr. at 130.[8]

24. In 1994 and 1995, Plaintiff received treatment at a mental health center. It appears that at least part of the 1995 treatment period took place in an inpatient setting, but only for a few days. Tr. at 102-109. The 1995 treatment focused on Plaintiff's treatment for premature ejaculation. Tr. at 111-128. Documentation as to Plaintiff's panic attacks indicate that these episodes are sporadic and short-lived. See, e.g., Tr. at 136, 143, 145, 160, 165.

---

[6] Plaintiff's back impairment was found not to limit Plaintiff's ability to work, Tr. at 20, and has not been raised as an issue on this appeal.

[7] As the ALJ noted, none of the other medical records reflected a similar diagnosis; Plaintiff's mental problems were elsewhere diagnosed as "anxiety." Tr. at 18.

[8] Although Plaintiff listed Prolixin, Cogentin and Anafranil (used to treat Obsessive-Compulsive Disorder) as medications prescribed for him since 1994, and told the ALJ he was currently taking them, Tr. at 207, it is not clear if Plaintiff had continued to follow this regimen throughout the relevant period. Tr. at 193. A therapist noted in December, 1993 that Plaintiff was refusing to take medications because he was "only concerned with his sexual problems." Tr. at 126.

8

25. A disability determination considers all of a claimant's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529, 416.929. Further, Plaintiff's statements as to the effect of his impairments are insufficient on their own to establish disability. 20 C.F.R. §§ 404.1528, 416.928. In this case, I find that the medical evidence is consistent with the ALJ's findings of nondisability, specifically, that Plaintiff's mental impairment does not significantly limit or reduce his capacity to work.

26. The record also contains a letter dated June 5, 1996, submitted two months after the administrative hearing. The letter is from a social worker stating that the Plaintiff had been hospitalized at the mental health center from May 29, 1996 to June 7, 1996, that Plaintiff had been diagnosed with depression, and that he was taking medication for anxiety. Tr. at 194. However, no medical records were included with the letter or submitted to the Appeals Council at a later time.

27. The letter brings with it no information about the effect of the medication on Plaintiff's symptoms, what Plaintiff's prognosis is, or anything which could reasonably be viewed as shedding light on whether Plaintiff's impairment interferes with Plaintiff's ability to work. Consequently, it is insufficient as "new evidence" which would have changed the outcome of the ALJ's decision. Hargis v. Sullivan, 945 F.2d 1482, 1493 (10th Cir. 1991). Thus, the ALJ's assessment of the impact of Mr. Rivas' mental problems on his ability to work was not in error.

**Third Alleged Error**

28. Last, Plaintiff contends that the application of the grids in this case was legally

9

improper, as Mr. Rivas has nonexertional impairments that affect his ability to perform the functions that light and sedentary work requires. Application of the grids is appropriate only if the claimant is capable of performing a full range of work required at a particular exertional level on a daily basis and if the claimant possesses the physical capacity to perform most of the jobs falling within that category. Ragland v. Shalala, 992 F.2d 1056, 1058 (10th Cir.1993).

29. In this appeal, Plaintiff does not dispute his physical ability or the ALJ's findings regarding his physical residual functional capacity. The sole issues revolve around Plaintiff's psychological impairments, i.e, his generalized anxiety and sexual dysfunction. I have already addressed the issue concerning Plaintiff's mental problems on his ability to work, and found that the ALJ did not err in finding that these problems do not significantly limit or reduce Plaintiff's capacity to work. See above. Thus, the ALJ's application of the grids was not legally improper. See Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (ALJ may rely upon the grids when no significant nonexertional impairment exists).

30. In sum, I find that (1) the ALJ did not err at step two of the sequential evaluation when he found that Mr. Rivas' sexual dysfunction was not a severe impairment; (2) the ALJ's assessment of the impact of Mr. Rivas' mental problems on his ability to work is supported by substantial evidence and is not contrary to law; and (3) the application of the grids in this case was legally proper, as Mr. Rivas' nonexertional impairments do not significantly affect his ability to perform the functions that light and sedentary work requires.

**Recommendation**

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing [8-1] be denied and this cause of action dismissed with prejudice. Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C).

_____
UNITED STATES MAGISTRATE JUDGE